UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| BETTY J. LICHTINGER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:09-CV-1611 (CEJ) |
| ) | |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On September 1, 2006, plaintiff Betty Lichtinger filed an application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (Tr. 64-66), with an alleged onset date of June 30, 2006. After plaintiff's applications were denied on initial consideration (Tr. 33-37), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 40).

The hearing was held on January 14, 2009. (Tr. 5-21). Plaintiff was represented by counsel. The ALJ issued a decision on April 22, 2009, denying plaintiff's claims. (Tr. 23-31). The Appeals Council denied plaintiff's request for review on July 25, 2009. (Tr. 1-3). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

At the time of the hearing, plaintiff was 52 years old. She had completed ninth grade; she had not obtained a GED. (Tr. 10-11). She resided in Hermann, Missouri, with her husband and 16-year-old daughter. (Tr. 10).

Plaintiff operated her own roofing company until her conditions interfered with her ability to climb ladders. (Tr. 13). She suffers from shortness of breath, light-headedness, and chronic bronchitis. (Tr. 14-16). Plaintiff testified that she becomes short-winded with almost any activity, including walking 20 or 40 feet, talking, eating, and vacuuming. (Tr. 14-15). She is allergic to dust, mold, and animals and is sensitive to fumes and odors. She is unable to handle extreme cold or hot weather. (Tr. 15-16). Her wheezing interferes with her sleeping, and she has headaches two or three times a week. (Tr. 16). She becomes distracted by light-headedness in the midst of tasks and frequently forgets what she is doing. (Tr. 17). She testified that she had enjoyed running her business and sometimes experiences frustration and sadness about being unable to work. (Tr. 18-19). When asked whether she had issues with depression, plaintiff testified that she occasionally sits and cries because she finds it hard to adjust to being idle. She had gained about 75 pounds in the two years before the hearing. (Tr. 12).

Plaintiff testified that she begins to wheeze after she has been on her feet for fifteen minutes. (Tr. 19). She can carry a gallon of milk from the car and up five steps to the kitchen, but she has to sit down when she arrives there. (Tr. 20). She tries to do a little bit around the house, but relies on her family members to do house cleaning. (Tr. 19). She does not prepare meals. She spends about five and a half hours a day in a recliner watching television, listening to the radio, or chatting with her daughter when the school day is over. (Tr. 20).

Plaintiff testified that she uses a nebulizer every four to six hours. (Tr. 17). She stated that she occasionally has low oxygen levels even without exertion. Plaintiff's lawyer noted that her medical records indicate that plaintiff smoked. In response,

plaintiff testified that her doctors wanted her to quit and that she had been "doing okay" for four months; i.e., she had been trying "so hard not to cheat." (Tr. 18).

The record contains a Disability Report completed by plaintiff. (Tr. 104-13). She listed the following disabling conditions: chronic [obstructive] pulmonary disease (COPD), extreme trouble breathing, inability to sweep or walk, constant cough, high blood pressure, dizzy spells, and chest pain. (Tr. 105). Plaintiff stated that these conditions began in 2000 and prevented her from working starting on June 30, 2006.

Plaintiff also completed a Function Report. (Tr. 84-91). She indicated that her sleep is interrupted due to wheezing. She reported that her daily activities include dusting, mopping or doing laundry. She noted that she cannot sweep because the dust makes it hard to breathe. She can clean for 15 minutes at a time before she needs to catch her breath; it can take her all day to clean one room. (Tr. 84, 86). She takes care of the family home with help from her husband and daughter; they feed the family pets. (Tr. 85). She can prepare oven-ready meals. (Tr. 86). She is able to drive. She does grocery shopping once a week, using a wheelchair in the store. (Tr. 87). She has no impairment in her ability to pay bills, count change, or use a checking account. (Tr. 87). She stated that she has no difficulty with personal care and does not need reminders regarding grooming or medications. (Tr. 86). Her interests and hobbies include watching television and sewing. (Tr. 88). She used to enjoy volunteering for school events and playing volleyball, basketball, and tennis, but is unable to do so now. (Tr. 88). In response to a question regarding things she liked to do with others, plaintiff stated that she visits with family members who come to see her. She has no difficulties getting along with others. (Tr. 89).

Plaintiff described the following abilities as affected by her illness: lifting, squatting, bending, standing, reaching, walking, talking, and stair climbing. She stated that she can walk a distance of 80 feet before needing to rest. (Tr. 89). She is able to finish what she starts and can follow written and spoken instructions. She stated that she gets along well with authority figures, has never lost a job due to problems getting along with others, and has no difficulties coping with changes in routine. (Tr. 90).

In the narrative portion of the report, plaintiff wrote that she had been diagnosed with COPD about six years earlier. She wrote that her condition worsened over the years and it was now hard "to function on everyday things." She noted that she has high blood pressure and asthma in addition to the COPD and has had severe asthma attacks. (Tr. 91).

Plaintiff completed a Work History Report. (Tr. 92-103). She had worked as a secretary, a receptionist, and gas station manger/clerk. In addition, she had owned and operated a retail clothing store and a roofing company. The physical requirements of her work as a receptionist or secretary included walking for .5 hours, standing for .5 hours, crouching for .5 hours, and sitting for 7 hours of each 8-hour work day. She never lifted more than 10 pounds. (Tr. 96-98).

### III. Medical Evidence

The medical record begins with an entry dated May 2, 2005, by Michael W. Mahoney, D.O. (Tr. 179). Plaintiff complained of coughing, wheezing, and shortness of breath even with short walks. She reported that she had had yellow and green sputum for a week. She also acknowledged that smoking made her feel worse and asserted that she had quit. On examination, Dr. Mahoney noted very coarse lung

sounds consistent with bronchitis and occasional wheezing. Her heart sounds were regular. Dr. Mahoney "suspect[ed] . . . allergic symptomotology along with bronchitis and aggravation of underlying asthma." She was prescribed Levaquin[1] and prednisone. Nursing notes dated July 29 and September 6, 2005 indicate that she was also prescribed Enalapril,[2] Nifedepine, Albuterol,[3] and Paxil.[4] (Tr. 179). On September 26, 2005, plaintiff was seen for a fractured toe.[5] (Tr. 178).

On December 19, 2005, Dr. Mahoney noted that plaintiff was complaining of coughing and marked shortness of breath. During a recent episode of coughing, concerned observers had called an ambulance for her but she refused to go the emergency room. She told Dr. Mahoney that Advair[6] had helped but she stopped taking it because she could not afford it. She used Albuterol and the nebulizer as needed, but Dr. Mahoney opined that plaintiff needed a prophylactic treatment as well. He indicated that he would prescribe Asthmacort for plaintiff but he "suspect[ed] she will probably not take this medication." Plaintiff was still smoking a pack of cigarettes

---

[1]Levaquin is a fluoroquinalone antibacterial indicated for treatment of adults with infections caused by designated, susceptible bacteria. Phys. Desk Ref. 2629 (6rth ed. 2010).

[2]Enalapril is used to treat high blood pressure. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a686022.html (last visited on May 25, 2010).

[3]Albuterol is an aerosol inhalant prescribed for treatment of bronchospasm. See Phys. Desk Ref. 3067 (60th ed. 2006).

[4]Paxil is a psychotropic drug indicated for the treatment of major depressive disorder, obsessive-compulsive disorder, panic disorder, social anxiety disorder, generalized anxiety disorder, and post-traumatic stress disorder. See Phys. Desk. Ref. 1501-03 (60th ed. 2006).

[5]She sustained the fracture while trying to catch a puppy.

[6]Advair is indicated for maintenance treatment of asthma and airflow obstruction in patients with COPD. See Phys. Desk Ref. 1275 (64th ed. 2010).

a day. "We have talked about this issue a number of times in the past and offered different options [including a] nicotine patch, Wellbutrin[7] and anything we can do to stop her habit of smoking." Dr. Mahoney noted that plaintiff "uses the smoking for stress" and opined that she "just doesn't want to quit," even though he had told her it was imperative that she do so and that she would require "constant oxygen" in the near future if she failed to give up smoking. (Tr. 177).

On May 1, 2006, plaintiff complained of sinus congestion. On examination, Dr. Mahoney noted coarse lung sounds but no wheezing. He again addressed the need for her to stop smoking. (Tr. 175). On May 18, 2006, plaintiff reported to Dr. Mahoney that she had tried her mother's recently prescribed Spiriva[8] and asked him to prescribe the drug for her. Dr. Mahoney noted that plaintiff "continues to smoke despite my counseling, begging and harassing her." On examination, plaintiff's heart sounds were regular. (Tr. 174).

Plaintiff returned to see Dr. Mahoney on July 3, 2006, with complaints of shortness of breath following minor exertion and coughing especially at night. Dr. Mahoney opined that plaintiff was in denial about her underlying pulmonary disease, noting that she continued to smoke and kept three cats despite her allergies. (Tr. 172). An x-ray of the chest showed no active disease. (Tr. 137).

---

[7]Wellbutrin, or Buproprion, is an antidepressant of the aminoketone class and is indicated for treatment of major depressive disorder. See Phys. Desk Ref. 1648-49 (63rd ed. 2009). It may be prescribed under the brand name Zyban to aid with smoking cessation. See http://www.nlm.nih.gov/medlineplus /druginfo/meds/a695033.html (last visited Sept. 22, 2010).

[8]Spiriva is a dry powder formulation of tiotropium bromide to be used with an oral inhalation device. See Phys. Desk Ref. 893 (64th ed. 2010).

Plaintiff was seen by Ousama Dabbagh, M.D., a pulmonary specialist, on August 16, 2006. (Tr. 147-50). Her chief complaint was shortness of breath, which had worsened over time and manifested with activity, such as when she climbed a half flight of stairs. She reported that she woke up at night with extreme breathlessness. She also had a cough that began when she started taking blood pressure medication; she reported blood streaks in sputum on two occasions. (Tr. 149). She did not have chest pain. She informed Dr. Dabbagh that she had smoked a pack of cigarettes a day for 30 years and had not attempted to stop despite knowing the risks. Plaintiff reported excessive daytime sleepiness and signs consistent with apnea. Dr. Dabbagh recommended that plaintiff participate in a sleep study and ordered a CT scan of the chest and lung function testing. (Tr. 150). In addition, he recommended that plaintiff change her blood pressure medications.

A pulmonary function test and a CT scan of the chest were completed on September 20, 2006. (Tr. 152-53, 165-66). The pulmonary function test showed a deterioration in her lung function and suggested that she had both COPD and asthma. (Tr. 156-57). The CT scan disclosed no masses or nodules but showed bilateral adrenal enlargement. (Tr. 165-66). An echocardiogram on September 27, 2006, indicated that plaintiff had reduced left ventricular function and diastolic dysfunction. (Tr. 158). On October 30, 2006, endocrinologist John Palmer, MD, opined that the bilateral adrenal enlargement identified by the CT scan were consistent with adenomas.[9] (Tr. 163).

Plaintiff returned to the Pulmonary Clinic to see Dr. Dabbagh on January 18, 2007. (Tr. 265-68). She reported that she had experienced shortness of breath,

---

[9]An adenoma is a benign tumor. See Stedman's Med. Dict. 24 (27th ed. 2000).

fatigue, and cough. She experienced improvement of her symptoms following a prescription for Levaquin and a short course of prednisone. (Tr. 266). Dr. Dabbagh noted that plaintiff failed to appear for a bronchoscopy and sleep study that had been scheduled because she was afraid of the tests. Dr. Dabbagh did not reschedule the procedure because plaintiff was improving. On examination, Dr. Dabbagh detected normal breath sounds without wheezing. (Tr. 266-67).

Dr. Mahoney saw plaintiff for blood pressure monitoring on January 29, 2007. Her blood pressure was "doing quite well," but her smoking and asthma were of concern and she was overusing her Albuterol inhaler. She had gained an additional six pounds and complained of pain in both feet and a burning sensation in her legs. (Tr. 254). On January 31, 2007, plaintiff was taken by ambulance to the emergency room with complaints of intermittent chest pain. (Tr. 193). Her EKG was normal and cardiac enzymes were negative. She declined to stay long enough to complete a second set of cardiac enzymes. The clinical impression was history of COPD and acute coronary syndrome, angina pectoris controlled by nitroglycerin. Id.; see also Tr. 208 (report of radiologic consult.)

On February 5, 2007, plaintiff was seen for an office visit. (Tr. 255). At that time she complained of rectal bleeding; she also reported an episode of chest pain that resolved when she rested. She was transferred to the emergency room. (Tr. 188-89, 196). A chest x-ray showed no active disease of the chest. (Tr. 209). A CT scan of the abdomen and pelvis showed a low density lesion in the left adrenal gland, consistent with a benign adenoma, and scattered diverticuli without evidence of diverticulitis. (Tr. 210).

On June 27, 2007, plaintiff returned to the emergency room with chest pains. (Tr. 206). An EKG and two sets of cardiac enzymes were negative. The clinical impression was "chest pain, unexplained, presumably noncardiogenic." Id.; see also Tr. 211 (report of radiologic consult.)

Plaintiff was seen by Dr. Mahoney on August 29, 2007. (Tr. 257). She was complaining of nasal congestion, but had no coughing. Her oxygen saturation level was 98% and her lungs sounded "distant but clear." Her heart sounds were regular without arrythmias or murmurs. She continued to smoke. She was diagnosed with respiratory infection and prescribed Ciprofloxacin[10] and Robitussin.

On November 19, 2007, Dr. Mahoney treated plaintiff for a sinus infection that caused complete occlusion of the left nasal passage. (Tr. 258). On February 4, 2008, plaintiff presented with coughing which Dr. Mahoney attributed to viral infection following exposure to influenza. Her lungs were relatively clear and her heart was regular. (Tr. 259). Plaintiff returned on August 6, 2008, complaining of persistent problems with her breathing. (Tr. 260). According to Dr. Mahoney, plaintiff was still smoking "½ pack of cigarettes a day and probably more. I have talked until I am blue in the face to get her to quit." On examination, her lungs revealed coarse peribronchial sounds with occasional expiratory wheezing. She was not in any kind of respiratory distress. She was prescribed Spiriva and directed to contact her pulmonologist. Id.

Plaintiff returned to see Dr. Dabbagh on August 25, 2008. (Tr. 269-72). Dr. Dabbagh noted that plaintiff had missed all scheduled appointments since January 2007 and again failed to appear for a sleep study. A bronchoscopy was performed

---

[10]Ciprofloxacin is a synthetic broad-spectrum antimicrobial agent. Phys. Desk Ref. 3073 (64th ed. 2010).

during a hospitalization in September 2007. (Tr. 270). Plaintiff was still smoking a pack of cigarettes a day. On examination, Dr. Dabbagh detected signs suggestive of pneumonia; a chest x-ray confirmed an infiltrate in the left lower lobe. She was prescribed Levaquin. In addition, plaintiff reported that she was waking several times during the night and was very tired. She requested a sleep study and a prescription to help her stop smoking.

Plaintiff returned to the pulmonary clinic on September 8, 2008. (Tr. 273-76). She reported that she had a cough with large amounts of sputum and pleuritic pain. Her blood pressure had also been high several times. She continued to smoke a pack a day. (Tr. 274). A CAT scan did not show any infiltrate or pulmonary embolism. Dr. Dabbagh ordered cultures. (Tr. 275).

On October 31, 2008, Dr. Mahoney noted that plaintiff "came in at the insistence of her husband." (Tr. 286). Her husband reported that she was wheezing at night and having trouble breathing. Plaintiff stated that she had nasal congestion, coughing, and wheezing for the past week to ten days. She continued to smoke and was not using the nebulizer as necessary, although she was taking the prescribed dosage of Advair. Dr. Mahoney diagnosed plaintiff with upper and lower respiratory infection with probable bronchitis and asthma flare. He prescribed Prednisone and instructed her again regarding proper use of the nebulizer. Dr. Mahoney noted that, in addition to smoking, plaintiff "basically has been rather noncompliant to recommendations with her asthma." Id.

On January 12, 2009, Dr. Mahoney wrote a note addressed "To Whom It May Concern." (Ex. 1 to plaintiff's brief) [Doc. #14-1]. Dr. Mahoney stated that plaintiff has significant COPD with asthma. Despite receiving the "maximum" treatment for

asthma, plaintiff's disease had progressed. Plaintiff continued to smoke and her prognosis was guarded. Dr. Mahoney noted that plaintiff's pulmonologist would have a "better grip on the severity of her asthma." Dr. Mahoney's letter is silent with respect to plaintiff's ability to work.

### IV. The ALJ's Decision

In the decision issued on April 22, 2009, the ALJ made the following findings:

1. Plaintiff met the insured status requirements of the Social Security Act through December 31, 2009.

2. Plaintiff had not engaged in substantial gainful activity since June 30, 2006, the alleged onset date.

3. Plaintiff has the following severe impairments: COPD and obesity.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity to perform the full range of sedentary work.

6. Plaintiff is capable of performing her past relevant work as a receptionist and secretary. This work does not require performance of work-related activities precluded by her residual functional capacity.

7. Plaintiff was not under a disability, as defined in the Social Security Act, from June 30, 2006, through the date of the decision.

(Tr. 28-31).

### V. Discussion

To be eligible for disability insurance benefits, a claimant must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). A claimant will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Serv. 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant is not, he is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

A.  **Standard of Review**

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1. the ALJ's credibility findings;

2. the plaintiff's vocational factors;

3. the medical evidence;

4. the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5. third-party corroboration of the plaintiff's impairments; and

6. when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by

substantial evidence. Pearsall, 274 F.3d at 1217, citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

B.  Analysis

Plaintiff contends that the ALJ improperly evaluated her ability to perform past relevant work in that he failed to make specific findings regarding the physical and mental demands of that work; the ALJ improperly assessed plaintiff's credibility; and the ALJ was required to obtain the testimony of a vocational expert.

1.  Ability to Perform Past Relevant Work

The ALJ determined that plaintiff retained the Residual Functional Capacity to perform sedentary work[11] and could return to her past relevant work as a receptionist or secretary, as previously performed by her. Plaintiff asserts that the ALJ did not fulfill his duty under S.S.R. 82-62 to develop the record regarding the physical and mental demands of her past work.

In determining that a claimant can return to past relevant work, the ALJ must make explicit findings regarding the actual mental and physical demands of the past work to determine whether the claimant is capable of performing the relevant tasks. Groeper v. Sullivan, 932 F.2d 1234, 1239 (8th Cir. 1991) (applying S.S.R. 82-62). "The claimant is the primary source for vocational documentation, and statements by

---

[11]The Social Security regulations state:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

the claimant regarding past work are generally sufficient for determining the skill level[,] exertional demands and nonexertional demands of such work." S.S.R. 82-62, 1982 WL 31386 at *3. See also Zeiler v. Barnhart, 384 F. 3d. 932, 936 (8th Cir. 2004) (noting that ALJ relied on claimant's description of her duties). The ALJ did not err by adopting plaintiff's description of her past work in determining the actual physical demands. (Tr. 31).

Plaintiff listed the physical requirements of her past work as a secretary and receptionist as walking for .5 hours, standing for .5 hours, and sitting for 7 hours of each 8-hour work day. The heaviest weight she was required to lift was less than 10 pounds. (Tr. 96-98). These requirements are well within the limits of sedentary work as set forth at 20 C.F.R. § 404.1567(a). Plaintiff argues, however, that her job as a receptionist required her to crouch, an activity precluded by her COPD. However, "[p]ostural limitations or restrictions related to such activities as . . . crouching . . . would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work." S.S.R. 96-9p at *7. Indeed, crouching is outside the scope of the traditional duties of receptionist or secretary, see Dictionary of Occupational Titles, 237.367-038 (receptionist); 201.362-030 (secretary), and thus the ALJ did not err by refusing to consider this limitation. See Jones v. Chater, 86 F2d 823, 825 (8th Cir. 1996) (claimant's past job "should be viewed along the lines of what this type of position entails nationwide"). Any assertion that plaintiff is unable to perform the mental demands of her past work fails in that she does no claim to suffer from any disabling mental conditions and none were found by the ALJ.

Plaintiff also contends that the ALJ erred in failing to take into account her need to rest. Plaintiff testified at the hearing that she frequently needs to sit and catch her breath if she is up and moving around or pushing herself. (Tr. 20). The need to sit frequently is not incompatible with the physical requirements of sedentary work. Plaintiff also contends that the ALJ failed to take into account the "possible need [for] significant 'unexcused' absences." Plaintiff offers no explanation for this concern, and there is no evidence in the record that she frequently missed work in the past. The Court cannot say that the ALJ erred in failing to address a speculative attendance issue.

### 2. Credibility Determination

"In order to assess a claimant's subjective complaints, the ALJ must make a credibility determination by considering the claimant's daily activities; duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions." Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). The claimant's work history and the absence of objective medical evidence to support the claimant's complaints are also relevant. Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000). A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question. Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006). Although an ALJ may not disregard subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary. Id. (quoting Ramirez v. Barnhart, 292 F.3d

576, 581 (8th Cir.2002)). The determination of a plaintiff's credibility is for the Commissioner, and not the Court, to make. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). Where an ALJ explicitly considers the Polaski factors and discredits the plaintiff's complaints for good reason, the courts will normally defer to that decision. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001), (quoting Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990)).

Plaintiff alleged that she was unable to walk any distance, and that her COPD caused her to cough, experience chest pains, and feel dizzy. The ALJ found that plaintiff's allegations regarding the intensity, persistence and limiting effects of these symptoms were not credible. (Tr. 29). In reaching this determination, the ALJ properly noted several inconsistencies between the medical evidence and plaintiff's allegations. Objective lung function tests showed that plaintiff's COPD was "mildly obstructive." Chest x-rays showed normal lung expansion, normal heart size, and no active disease and a bronchoscopy and CT scan of the chest were similarly unremarkable. Although an echocardiogram suggested reduced left ventricular function and diastolic dysfunction, there is no evidence in the record that plaintiff received treatment for these conditions. Her episodes of chest pain were attributed to a noncardiogenic source. Finally, no treating physician has stated that plaintiff is totally disabled by her medical conditions or imposed restrictions incompatible with the requirements of sedentary work. The lack of objective medical evidence is a factor the ALJ may consider in making a credibility determination. Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004). The ALJ also addressed plaintiff's noncompliance with treatment recommendations, most notably the repeated requests that she quit smoking. Her noncompliance in this regard is particularly significant in light of the fact

that the smoking directly worsens the alleged disabling condition. "Impairments that are controllable or amenable to treatment do not support a finding of disability, and '[f]ailure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits.'" Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) (quoting Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995)). In addition, the record indicates that plaintiff missed several appointments with Dr. Dabbagh and did not follow through with scheduled procedures. Similarly, Dr. Mahoney noted that plaintiff did not follow the regimen for appropriate management of her asthma. Noncompliance with treatment is a factor that weighs against a claimant's credibility. See Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005).

Based on the foregoing, the Court cannot say that the ALJ's credibility determination was unsupported by the record as a whole.

### 3. Vocational Expert Testimony

Plaintiff argues that the ALJ erred in failing to obtain the testimony of a vocational expert because she has nonexertional impairments. Vocational expert testimony is not required at step four where the claimant retains the burden of proving she cannot perform her prior work. Banks v. Massanari, 258 F.3d 820, 827 (8th Cir. 2001). Substantial evidence in the record support the ALJ's decision that plaintiff could return to her past relevant work and the ALJ was not required to obtain the testimony of a vocational expert.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her brief in support of complaint [Doc. #14] is **denied**.

A separate judgment in accordance with this order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of February, 2011.